The next case is Daytree at Cortland Square v. Walsh. May I proceed? Good morning, your honors. May it please the court. My name is Andrew Campanelli. I'm an attorney representing the appellants in this case. As I'm sure your honors are acutely aware, there were not one but two district court judges who had an opportunity to rule on the issues of immunity in this case. The first decision on immunity was rendered by Justice Bianco when the defendants initially filed a motion to dismiss based upon qualified immunity and absolute immunity. At that time, Judge Bianco correctly ruled that dismissal was unwarranted and improper under either theory, absolute immunity or qualified immunity. The reason he ruled is because the statements that Mr. Walsh published both to the insurance companies and the local newspapers contained not merely notice that would be required to put an insurance company on notice, but they included gratuitous statements which were unnecessary to put any insurance company on notice. Those statements were both that the town had completed an investigation into the dumping and that they determined that Daytree at Cortland Square was a responsible party. The judge ruled that absolute immunity could not cover that because it wasn't necessary for Mr. Walsh to publish that statement in the course of carrying out his duties. Judge Bianco also ruled that qualified immunity would not cover those statements if it turned out that the statements were false and were published with malice either in the form of affirmative malice or reckless disregard for the truth or falsity. There's no dispute here that Mr. Walsh did perform an investigation of sorts, right? I mean, he reviewed town public safety field reports and surveillance video and noted the presence of trucks marked with Daytree in the park during the relevant period, looked at a report of a park ranger. He did all that before he sent the letter. Am I correct about that? If I may, Judge, I respectfully submit no reasonable investigation was conducted. He did not view the videotapes before he issued the letter. Also, there were two town employees who had direct supervision of the park at the time the dumping occurred. The commissioner of parks, Robert Montiore, and the deputy commissioner, the secretary to the commissioner. Both of them gave sworn written statements to the district attorney's office that the persons who had been involved in the dumping in the park were Thomas Daytree Jr. and Thomas Daytree Jr.'s company, not Thomas Daytree Sr. Those sworn statements are on the record at pages 148 and 140. The town, the only town defendants that had any personal knowledge of the dumping all knew it was Daytree Jr. and Daytree Jr.'s company. Mr. Walsh never questioned them at all. In fact, there was also an eyewitness, the park ranger, who filled out a statement. Mr. Walsh never spoke to him. He never spoke to a single town employee, and there were hundreds of them. No park rangers, not the commissioner, nobody. He didn't watch the videotapes. He conducted no investigation whatsoever. Instead, he had a secret meeting in his home with defendant Michael Torres, who was the number two in command at the Suffolk County Conservative Committee. Now, defendant Torres had two meetings. When they learned of the dumping, there was what's described as an emergency meeting. Mr. Torres met with Montiore and Thomas Daytree Jr. at a restaurant to discuss the dumping, to do political damage control, to find out how to cover them because they were supervising it. That was the first meeting with Torres. The second meeting, however, was with Michael Walsh at Michael Walsh's home, where Michael Walsh showed Michael Torres photographs of the dumping. There's no record of this in the town's records. Michael Walsh alleged under oath he never discussed the dumping with Michael Torres, and Michael Torres was never at his house. Never discussing it is alleged in 1337 of the record. Mr. Torres testified to the contrary, that he did meet with Michael Walsh in Michael Walsh's home, and that Michael Walsh showed him the photographs of the dumping. Why was Michael Walsh meeting with someone who was not an agent, employee, or official of the town, but was the number two in charge at the conservative party? What possible thing could they discuss before he sent out those letters? Even worse, he didn't really send the letters to the insurance companies. They were disseminated to the press. Now, he testified that the only person who gave information to the press was him. The only person to conduct an investigation was him. And yet, the press got the letters. No FOIA requests were served. They're not in the records. The press got the records and quoted them verbatim. The only way they could have got them is directly from Michael Walsh himself. So to the extent that he published the gratuitous statements about completing an investigation, which never occurred, and in fact his boss, the town attorney, said it's not that an investigation has been completed, and it's not that we identified who did it. It's just in case. So both parts of Mr. Walsh's statements were false, and he either knew them to be false or he was completely reckless with regard to making those statements. That carries over to the Stigma Plus claim and the conspiracy claim. Judge Block said that there's no evidence of a conspiracy. Well, why would Michael Walsh meet with Mr. Torres in his home? The defendants lament that we let out the head of the party, whose name escapes me at the moment, the number one commander of the conservative party. Well, we let him out because we don't have evidence of any meetings with him. We can't prove he was directly involved. But we do know that Michael Torres was involved in not one but two meetings at periods in time when he held no office whatsoever with the town. Why were they meeting with him? And for the record, Michael Torres' statements about the calls are at 1234 and 1238 and 1268. The meeting where Torres says, testifies under oath he met with Walsh is at 1276. He met with Walsh in Walsh's home. Now, with regard to the conspiracy claim, again, we let... That's your best evidence of conspiracy at the meeting? It's the totality of the circumstance. The two meetings. The two meetings. And the fact that with all this evidence, Michael, he had the videotape. He never looked at the videotape. He never questioned one person. He never questioned the only witnesses who supervised the park, the only witness who saw the dumping. He never, ever approached them, never questioned them, never emailed anybody in the town, never sought any information. Instead, he had a meeting with Michael Torres instead. Why? A meeting plus the circumstantial evidence of what he did not do. Yes. As the lawyer makes crystal clear, when people commit conspiracies, they don't make records. And thus, plaintiffs are entitled to establish them by circumstantial evidence. I respectfully submit the circumstantial evidence here is overwhelming. Why would he make a patently false statement such as that? Why would he claim that when the records in the town's own files reflect precisely the opposite? In addition, the judge threw out the Breach contract case, which was rather remarkable. The Daitries are owed several hundred thousand dollars for the work they did at the town. Now, unfortunately, while the services were being provided on the town contract, the union increased the rate of prevailing wages by 0.2 percent. Neither the town nor the Daitries knew about it. Nobody figured it out. At the time the town terminated the contract, they had no idea. Instead, the district attorney's office found out about it. And then they tried to retroactively say, well, we canceled it because of that. And so, by the way, the Daitries paid the difference. But yet, the judge threw out the Breach of Contract case where they were owed hundreds of thousands of dollars. And you've reserved three minutes of rebuttal time. Do you want to use some of that now? Only if you have any questions. Otherwise, I'll wait for rebuttal, Your Honor. Thank you very much. Good morning, Your Honors. May it please the Court. My name is Timothy Hill from Messina, Perillo, and Hill. With me is my colleague, John DeCiccio. We had a joint brief. I will be presenting our argument on behalf of the appellees, Semt, Sicaly, Michael Walsh, and the Town of Iceland. I must begin a little bit in a different area than I thought because numerous statements were just made that were not even part of the briefing. So I'm a little bit taken aback by some of the claims that have just been made. But this follows a pattern of continually revising what Judge Block correctly characterized as a factually unsubstantiated theory. This elaborate complaint begins with Mr. Campanelli indicating he couldn't recall the name, but it was a reference to Edward Walsh, who was the first named defendant before he was relieved from the case. His name appears throughout the complaint. He is alleged to be the mastermind of this theory, which was then fully retracted, and despite inquiries as to whether the complaint should be amended since it was eviscerated by that retraction, that amendment never came. The focus on Judge Bianco's decision on the motion to dismiss is a distraction. Obviously, we're at a different stage of the proceedings. That decision frequently refers to the fact that it's being made at the pleading stage where the benefits of the pleadings are given. They're due at that time. Why don't you address why Michael Walsh, as Deputy Town Attorney, is entitled to absolute immunity here, as Judge Block determined? Correct. So the town is self-insured. So if there's a car accident, if there's a trip and fall, if the town suffers a loss, it is its own insurer up to a very significant amount, at which point I believe there's excess insurance. This event caused a significant exposure to potentially need to pay for the remediation of this park. Mr. Walsh is the key person at the town in terms of risk management, in terms of assessing when damaged claims come in like this and responding to them. This is fully within the ambit of his duties to send a letter to an insurance company, and that is why the absolute privilege attaches. Could you also address, I started with your adversary, asking about what the record reflects about whether Mr. Walsh conducted an investigation. If we disagree with Judge Block about absolute immunity, are the statements in the letter substantially accurate in your view? Yes, there was an investigation. What I understand the appellant to be saying is a critique of that investigation, but that is not what the standard should be here. As your Honor pointed out, he reviewed the park ranger records. This was a situation that had been percolating from about January of that year through April, at which time a DA subpoena came in. So all of that information in a very short amount of time was able to be funneled to his attention. He conducted the Department of State corporation search when the park ranger's report reflected a certain corporate name and a certain phone number that was searched in the corporate database. Repeatedly coming up was this multiplicity of corporations that are in the DATRE, DAYTRE, family of names, all of which have the same corporate address. So there was a significant amount of information that was reviewed and constitutes an investigation for the purposes that Mr. Walsh was conducting, which is to do what he needed to do to protect the town's interest, which is ultimately the public's interest as the public fisc. He's not the DA, which was conducting its own larger investigation, which has a much higher burden. He needed to find out what he needed to do to do it in a prompt manner since there are draconian penalties for not making timely notice of a potential claim. In addition, that investigation also included the identification of DATRE at Cortland Square employees that had been issued tickets inside the park, again placing DATRE at Cortland Square in the park. The video, Mr. Walsh was cautious. He absolutely reviewed the video. What he could not precisely confirm on his deposition was whether he reviewed it before or after those letters went out. I suspect he absolutely did, but he was cautious not to say that since he didn't have the exact timeline in his memory at that point. So the issuance of this letter was fully within the ambit of his duties. The absolute privilege, therefore, attaches that disposes of both the defamation and the stigma plus claims. There are other qualified privileges that I believe also apply here. Those really haven't been responded to. I understand that the district court didn't need to, although it briefly mentions them. But both the regular governmental qualified privilege applies. That then imposes a burden on the appellant who has the burden of proof at that point to prove actual malice. All that's presented in this appeal is more conjecture. It's speculation upon speculation without any evidence. There are telling references in the briefing to the appendix in its entirety without any specificity of where one would look to find that evidence. So in conclusion, the privileges apply. I just briefly want to point out with respect to the breach contract, there's an admission that a material provision of that contract was breached, and that was also properly. Mr. Hill, quick question here. I'm unclear based on the record. Was Daytree criminally prosecuted for its underpayment of employees in violation of the prevailing wage law? Yes, the corporate entity was. Does that appear somewhere in the record? Yes, including their guilty plea. I apologize. I don't have a page site to provide you right. That's all right. When you sit down and you are listening in repose, you will check it and let us know. I will absolutely do that. And what's the current status of Roberto Clemente Park? That's a very big success story for the town. It's been fully remediated. Is it still closed off to the public? No, it's wide open. I believe there's a pool. There's splash parks. It's a big success story for the town that it's been able to be reopened. Thank you. Some of us are Roberto Clemente fans. I am, too. You are a great right fielder. Thank you. Thank you. Very briefly, Your Honors, two things. Oh, I'm so sorry. I'm sorry. Good morning, Your Honors. Joseph Ferrante for Mr. Michael Torres. Since I could read my reply brief word for word in the time that I have allotted, I will hand over my extra time to my colleagues if they require it. Very simply, what I just heard is that my client met with Mr. Walsh once or twice. Mr. Walsh misremembered that my client was as honest and forthright as he could be at his deposition. It doesn't amount to a conspiracy for anything between my client and the town or any of the town players. If I remember his deposition correctly, in fact, my client is involved in the conservative party, and he testified that he went to dozens if not hundreds of events, fundraisers, meetings, et cetera, putting that all together and claiming that any one of those, any time my client met with someone that they could possibly be conspiring against the Daytree family just frankly doesn't make any sense. I believe Judge Block's decision took into account the actual record and the depositions, and Mr. Torres had nothing to do with this, has no conspiracy with the town whatsoever, and I think the decision is correct. Thank you. Thank you so much. I think I can go now. Your Honors, I just want to reply briefly to two issues that were raised by opposing counsel. Opposing counsel said that Mr. Walsh allegedly reviewed the Park Ranger records in his investigation. There's only one record. There's one sheet, and it's a sheet from Park Ranger Kearns, and he was the only eyewitness, and he wrote down that he saw a truck with the name Daytree spelled D-A-T-R-E on it, and it had a telephone number. Mr. Walsh made no effort to ascertain whose telephone number that was, and there's proof in the record of that, because in the tree contract, Daytree at Cortlandt Square sent hundreds of invoices. There are hundreds if not thousands of records back and forth between Daytree at Cortlandt Square and the town, and they show that Daytree at Cortlandt Square's phone number is not the telephone number that was on the only record produced by the Park Rangers. Had Mr. Walsh actually looked at it or called the number or looked at any records in the town, he would have known that, but he didn't. Also, it's been represented by Judge Block and by the appellees that Thomas Daytree Jr.'s company shared space with Daytree at Cortlandt Square. It's false. They had separate suites in the same building. I have separate suites with other law firms in the same building. We're not the same company. The suites are not joined. They have separate offices, separate computer systems, separate billing records. They were completely separate and distinct entities, and everyone in the town, including Montiori, Robinson, and Walsh, knew it. Thank you, Your Honor. Thank you all, and we'll take the matter under advisement.